Devin Bolton (SBN 290037)
  dbolton@weitzlux.com
**WEITZ & LUXENBERG, PC**
1880 Century Park East, Suite 700
Los Angeles, CA 90067
Phone: (310) 247-0921
Fax:    (212) 344-5461

[Additional Attorneys for Plaintiff Listed on Back Cover]

*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| SUMNER DAVENPORT, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>L'OREAL USA, INC.,<br><br>Defendant. | **Civil Action No.:** 2:22-CV-1195<br><br>**COMPLAINT FOR DAMAGES**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff, Sumner Davenport, on behalf of herself and all others similarly situated, files this class action complaint against Defendant L'Oreal USA, Inc. On personal knowledge of her own circumstances and upon investigation and information and belief of her counsel, Plaintiff Davenport alleges the following:

## JURISDICTION AND VENUE

1.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2) because this civil action is a class action in which the matter in controversy exceeds $5,000,000 exclusive of interest and costs, and Plaintiff is a citizen of a state that is different than the state of which Defendant is a citizen.

2.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiff's and the Class Members' claims occurred in this District, and Defendant is subject to the Court's personal jurisdiction.

3.    As a result of Defendant's designing, developing, advertising, selling, and distributing the cosmetic products described herein to consumers throughout California, either

1   directly or indirectly through third parties or related entities, Defendant obtained the benefits of

2   California law and profited from California commerce.

3       4.      Defendant conducted systematic and continuous business activities in and

4   throughout the State of California and otherwise intentionally availed itself of the markets of the

5   State of California through the promotion and marketing of its products.

6                                    **PARTIES**

7       5.      Plaintiff Sumner Davenport resides in California, as she did at all relevant times

8   during the conduct alleged in this Complaint.

9       6.      Defendant L'Oreal USA, Inc. is a Delaware corporation with a principal place of

10  business in New York, New York. At all times relevant to this Complaint, L'Oreal USA, Inc. has

11  transacted business in this judicial district and throughout the United States, including in California.

12                              **STATEMENT OF THE CASE**

13      7.      L'Oreal USA, Inc., one of the largest cosmetics companies in the world, intentionally

14  fails to disclose to consumers that its popular waterproof mascara products contain Per and

15  Polyfluoroalkyl Substances, or "PFAS," despite the fact that L'Oreal knew or should have known

16  that this information is material to consumers.

17      8.      Instead, L'Oreal represented that its waterproof mascaras were safe, effective, high

18  quality, and appropriate for use on consumers' eyelashes.

19      9.      However, what L'Oreal did not tell consumers is that PFAS, which can have adverse

20  effects on humans and can bioaccumulate in human's bodies, are present in detectable amounts in

21  its waterproof mascaras. Even very low levels of PFAS can be toxic to humans.

22      10.     This is true even where PFAS are not ingested but are rather applied to skin because

23  PFAS can be absorbed through the skin. This risk is particularly high where the PFAS are applied

24  near the eyes, as is the case with mascara products.

25      11.     From at least 2018 through the present, Defendant's waterproof mascara was

26  misleadingly and fraudulently advertised because it failed to disclose the presence of PFAS in

27  L'Oreal's waterproof mascara products. This failure to warn injured reasonable consumers,

28  including Plaintiff, who reasonably relied upon Defendant's misleading packaging and ingredient

list that did not disclose that the waterproof mascara products contained harmful PFAS. Had Plaintiff and the putative Class known that L'Oreal's waterproof mascara products contained PFAS, they would not have purchased the products and/or would have paid less for them.

## I.     THE COSMETICS INDUSTRY

### A.     Cosmetics are a Multi-Billion Dollar Industry that is Largely Unregulated

12.     Personal care products are a multi-billion-dollar industry in the United States. In 2019 alone, the retail value of personal care products was estimated to be greater than $100 billion in North America, approximately $20 billion of which came from cosmetic products.

13.     In the United States, women spend, on average, $313 per month on beauty products, including cosmetics, and that number is only growing. The most popular products are eye products, particularly mascaras, and lip products.[1]

14.     The cosmetics industry is dominated by large, multinational companies with significant brand recognition and correspondingly significant sales, including L'Oreal USA, Inc. (which owns both L'Oreal and Maybelline branded products), Coty (which owns the CoverGirl brand) and Revlon.

15.     A recent study from 2021 found that U.S. consumers were both most aware of, and had actually purchased products within the last year from, the CoverGirl, Maybelline, L'Oreal and Revlon brands.[2]

16.     The use and labeling of cosmetic products ingredients in the United States is regulated by the Federal Food, Drug, and Cosmetics Act of 1938 and the Fair Packaging and Labeling Act of 1967. Cosmetic products are those that are "intended to be rubbed, poured, sprinkled, sprayed on, introduced into, or otherwise applied to the human body...for cleansing, beautifying, promoting attractiveness, or altering the appearance." FD&C Act, sec. 201(i).

17.     However, with the exception of some color additives, the FDA does not require cosmetic ingredients or cosmetics products to have FDA approval prior to entering the market, and

---

[1] https://www.byrdie.com/average-cost-of-beauty-maintenance

[2] https://www.statista.com/topics/1008/cosmetics-industry/

federal regulations also do not regulate the type or kind of testing that is needed to determine the safety of cosmetic ingredients or products.[3]

18.     The only oversight that exists is entirely voluntary on the part of cosmetics companies. The Voluntary Cosmetic Reporting Program is a "voluntary registration system for cosmetic products" where companies can register the brand name and ingredients of their products.

19.     The identification of cosmetic product ingredients in the United States generally follow conventions set forth by the International Nomenclature of Cosmetic Ingredients (ICNI), which established standards for naming cosmetic ingredients. The ICNI list is maintained by the Personal Care Products Council, an industry trade group comprised of over 600 member companies.

20.     The Personal Care Products Council also funds the Cosmetic Ingredient Review, which purportedly assesses the safety of cosmetic ingredients. But, again, participation is entirely voluntary, meaning that, in general, the cosmetics industry is subject to essentially no oversight and consumers are left to simply trust the manufacturers of cosmetics products that the products are safe for use.

**B.     Consumers Value Safe and Healthy Cosmetic Products**

21.     The global market for natural cosmetics and personal care products has increased substantially over the past three years, increasing from almost 34.5 billion dollars in 2018 to roughly 54.5 billion dollars expected in the year 2027.[4]

22.     This growth has been driven by increased consumer demand for natural ingredients and "green" products in general.[5]  One study found that approximately 70% of U.S. consumers ages 18-29 would prefer to use natural or organic cosmetics.[6]

23.     The growth has also been driven by legitimate concerns that consumers have about the contents of the products they use on their skin and body. For example, consumers have pursued

---

[3] https://www.fda.gov/cosmetics/voluntary-cosmetic-registration-program

[4] https://www.statista.com/statistics/673641/global-market-value-for-natural-cosmetics/

[5] https://www.futuremarketinsights.com/reports/organic-cosmetics-market

[6] https://disturbmenot.co/beauty-industry-statistics/

high profile lawsuits like the one against Johnson & Johnson related to its baby powder causing ovarian cancer (*see, e.g.*, *Ingham v. Johnson & Johnson*, 608 S.W.3d 663, 724 (Mo. Ct. App. 2020), *reh'g and/or transfer denied* (July 28, 2020), *transfer denied* (Nov. 3, 2020), *cert. denied*, No. 20-1223, 2021 WL 2194948 (U.S. June 1, 2021) or the class action case against Wen hair care company alleging that its products made people's hair fall out (*see, e.g.*, *Collazo v. Wen by Chaz Dean, Inc.*, No. 215CV01974ODWAGR, 2015 WL 4398559, at *1 (C.D. Cal. July 17, 2015). These types of high-profile lawsuits have made consumers afraid of chemicals and more interested in products that are "natural" and "safe."[7]

24.     In response, many companies are replacing synthetic chemicals with natural ingredients.

25.     For example, popular beauty retailer Sephora has created an internal "seal of approval" to designate "clean" beauty brands. As of July 2021, one of Sephora's requirements for that designation is that the product does not contain PFAs.[8] Sephora's website lists 374 cosmetics products, including mascara and lip products, that have attained its "clean" designation.[9]

26.     Ulta Beauty, another large cosmetics retailer, also maintains a "clean ingredients" list of cosmetics made without certain harmful ingredients, including PFAS.[10]

27.     Similarly, this increased demand has spurred the expansion of retailers dedicated to "clean" beauty, including Credo, which launched in 2015 and currently has ten brick and mortar retail locations in the U.S. and sells 418 separate cosmetics products on its website, all of which it contends are free of any of the 2,700 ingredients on its "Dirty List," including PFAs.[11]

28.     Even retailers like Target and CVS have dedicated additional shelf-space to natural

---

[7]    https://www.vox.com/the-goods/2018/9/18/17866150/natural-clean-beauty-products-feinstein-cosmetics-bill-fda

[8] https://www.sephora.com/beauty/clean-beauty-products

[9] https://www.sephora.com/shop/clean-makeup

[10] https://www.ulta.com/conscious-beauty/clean-ingredients/

[11]https://cdn.shopify.com/s/files/1/0637/6147/files/The_Dirty_List_PDF_August_Update.pdf?v=1598294504

beauty offerings.[12]

29.     Retailer willingness to incorporate and promote "clean" beauty products is due in part to consumers' willingness to pay more for these products that they perceive as a safer and healthier alternative to traditional brands. For example, a popular brand called Benefit, which is not "clean," sells a highly-rated foundation for $30, whereas Tarte, another popular brand, sells a highly-rated, but "clean" foundation for $39.[13]

## II.     PFAS ARE TOXIC AND POSE SUBSTANTIAL HEALTH RISKS TO HUMANS AND THE ENVIRONMENT

30.     PFAS are human-made, synthetic chemicals that do not exist naturally in the environment. They have been used for decades in industrial processes and to produce consumer, household, and commercial products.

31.     Consumer products manufactured with PFAS were often promoted as being resistant to heat and stains, long-lasting, and capable of repelling water, oil, and grease. Companies have utilized PFAS to make, among other things, carpets, clothing, fabrics for furniture, paper packaging for food, and other materials such as cookware that are resistant to water, grease, or stains.

32.     Although there are thousands of unique PFAS in existence, the details of many of these compounds are proprietary and known only to manufacturers and industrial users. But, what all PFAS share is that they contain multiple carbon-fluorine bonds, considered one of the strongest in chemistry, making them highly persistent in the environment and in human and animal bodies. In addition, the shared, characteristic chemistry common to all PFAS confers on each of these compounds hydrophobic and oleophobic properties, making PFAS effective surface protectors.

33.     PFAS are extremely soluble in water, which has led to their discovery in groundwater, rivers, and the ocean, as well as drinking water resources, fish, and marine mammals.

---

[12]   https://www.vox.com/the-goods/2018/9/18/17866150/natural-clean-beauty-products-feinstein-cosmetics-bill-fda

[13]https://www.huffpost.com/entry/why-clean-beauty-is-more-expensive_l_5fdb7307c5b6f24ae35e39d8

34.     PFAS can be categorized as either "long-chain" or "short-chain" based on the number of carbon atoms they contain. Long-chain PFAS contain 7 or more carbon atoms, while PFAS containing fewer than 7 carbon atoms are considered short chain.

35.     Long-chain PFAS such as perfluorooctanoic acid (PFOA) and perfluorooctane sulfonate (PFOS) have been widely detected in environmental samples, wildlife, and humans across the globe. Long-chain PFAS bioaccumulate and bio-magnify in both humans and in wildlife.

36.     In the Stockholm Convention on Persistent Organic Pollutants, PFOS is listed in Annex B. Annex B consists of persistent organic pollutants whose production, use, import, and export the Convention aims to restrict.

37.     The European Union specifically regulates products containing PFAS, restricting the manufacture or import of products containing more than 25 parts per billion (ppb) of PFOA.

38.     In October 2021, the US government announced its "PFAS Strategic Roadmap," which is an interagency plan to combat the continued use and release of PFAS. As part of the Strategic Roadmap, the Environmental Protection Agency (EPA) committed to designating PFOA and PFOS as "hazardous substances" under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA); finalizing a PFAS reporting rule under the Toxic Substances Control Act (TSCA) section 8(e); and publishing toxicity assessments for 7 widely-used PFAS, including the short-chain compound GenX, PFBA, PFHxA, PFHxS, PFNA, and PFDA.

39.     Following announcement of the Strategic Roadmap, a majority of the EPA's Science Advisory Board (SAB) agreed with the EPA that PFOA is a "likely carcinogen," with some members supporting a designation of "carcinogen." For PFOS, the SAB indicated that the evidence supports a label of "likely carcinogen."

40.     Short-chain PFAS unfortunately pose health and safety risks that are similar to their long-chain counterparts.

41.     Short-chain PFAS consist of multiple carbon-fluorine bonds, which, like long-chain PFAS, makes them highly persistent in the environment. They also bioaccumulate in human and animal bodies.

42.     A 2019 study conducted by the U.S. Department of Health and Human Services'

National Toxicology Program found that short-chain PFAS have the same adverse effects as long-chain compounds. This study determined that both long and short-chain PFAS compounds affect the same organ systems, with the greatest impact observed in the liver and thyroid hormone.[14]

43.    Humans may be exposed to PFAS through a variety of pathways, including ingestion, inhalation, and skin absorption. Studies dating back at least a decade have indicated that PFAS can be absorbed through skin, with evidence showing that PFAS in the blood increase after application to skin.

44.    Many PFAS, both long and short chain, are toxic to humans at extremely low levels. Exposure to certain PFAS is associated in the medical and scientific literature with harmful and serious health effects in humans and animals, including but not limited to: (a) altered growth; (b) impacts to learning and behavior of infants and older children; (c) lowering a woman's chance of getting pregnant; (d) interference with the body's natural hormones; (e) increased cholesterol levels; (f) modulation of the immune system; (g) testicular and kidney cancers; (h) thyroid disease; (i) high uric acid levels; (j) elevated liver enzymes; (k) ulcerative colitis; and (l) pregnancy-induced hypertension.

45.    The International Agency for Research on Cancer (IARC) has classified PFOA as possibly carcinogenic to humans.[15]

46.    There is also evidence in the scientific literature that PFAS exposure is positively correlated with certain metabolic diseases, such as diabetes, overweight, obesity, and heart disease.

47.    The Center for Disease Control's Agency for Toxic Substances and Disease Registry has recognized that exposure to PFAS may impact the immune system and reduce antibody response to vaccines. This is especially significant given the current public health risks posed by COVID-19 and efforts to protect against the virus with vaccines.

48.    PFAS is capable of crossing the placenta, meaning pregnant women transfer PFAS

---

[14] https://ntp.niehs.nih.gov/whatwestudy/topics/pfas/index.html

[15] https://monographs.iarc.who.int/wp-content/uploads/2018/06/mono110-01.pdf?source=post_page

to their unborn children. Women exposed to PFAS during pregnancy have higher risks of gestational diabetes and pre-eclampsia, and their babies are more likely to undergo abnormal growth in utero, leading to low birth weight, and later face an increased risk of childhood obesity and infections.

49.     Researchers have begun to find significant increases of certain short-chain PFAS in the blood of sample populations, raising concerns that short-chain PFAS are assuming the body burden once exclusively occupied by long-chain compounds.

50.     Consumers are rightfully concerned about the presence or risk of PFAS in various products.

51.     However, PFAS are essentially unregulated at the federal level. For example, the Safe Drinking Water Act ("SDWA") protects public water supplies across the U.S. and is enforced by the Environmental Protection Agency (EPA). Under this law, the EPA has not (although it could) formally created a Maximum Contaminant Level for PFAS in the water supply. Rather, the EPA has issued a health advisory for PFOA and PFOS that serve as "informal technical guidance" to assist government officials and water system managers in sampling and treating PFOA and PFOS in drinking water.[16]

52.     Over the past decade, several states have enacted maximum contaminant levels regulating certain PFAS, including PFOA and PFOS, in drinking water.

53.     California has been on the forefront of enacting legislation to manage and lessen the health and safety risks of PFAS for its citizens.

54.     The California Office of Environmental Health Hazard Assessment (OEHHA), for example, has proposed a Public Health Goal for PFOA in drinking water of 0.007 parts per trillion (ppt) and a Public Health Goal for PFOS of 1 ppt.[17]

55.     California Health and Safety Code 116378 provides that the state can order public water systems to monitor for PFAS. California's Proposition 65 requires products to carry a warning

---

[16] https://www.epa.gov/pfas/pfas-laws-and-regulations

[17]     https://oehha.ca.gov/water/report/perfluorooctanoic-acid-pfoa-and-perfluorooctane-sulfonic-acid-pfos-drinking-water

that they contain PFOA and PFOS if they are sold in California and, if not, private enforcement action is permitted. In 2020, California began requiring public water suppliers to notify customers if their water contains PFAS.

56.     In October 2020, California passed a law titled the Toxic Free Cosmetics Act, Assembly Bill 2762, that, starting January 1, 2025, will prohibit the manufacturing or selling of any cosmetic product with any intentionally added amount of 24 specified chemicals, including PFAS.

57.     In March 2021, California's OEHHA released a Notice of Intent to list PFOA as a carcinogen under Proposition 65. In December 2021, the OEHHA approved the listing of PFOS as a carcinogen under Proposition 65.

58.     California recently passed legislation banning the use of PFAS in paper-based food packaging as well as the disclosure of the presence of PFAS in cookware.[18]  This bill, Assembly Bill 1200, builds off similar food-packaging legislation passed in 2020 in New York.[19]

59.     The State of New York was one of the first to recognize that PFAS were harmful to humans and should be regulated. In 2016, it took steps to regulate when and how PFAS could knowingly be released into the environment, for example for firefighting purposes.[20]  Then, in 2020, New York enacted a law prohibiting the sale of food packaging containing PFAS, effective Dec. 31, 2022.[21]

60.     Similarly, in July of 2021, the State of Connecticut signed a bill into law banning the use of firefighting foam and food packaging that contains PFAS.[22]  An even broader law was passed in Maine in July 2021 that bans PFAS in nearly all products, stating as of Jan. 1, 2030, "a person

---

[18] https://www.nrdc.org/experts/avinash-kar/ca-bill-reduce-toxic-pfas-exposures-passed-legislature
[19] Id.

[20] https://www.dec.ny.gov/chemical/108831.html

[21]https://www.natlawreview.com/article/new-york-bans-pfas-food-packaging#:~:text=New%20York%20State%20Governor%20Andrew,%2C%20effective%20December%2031%2C%202022

[22]https://portal.ct.gov/Office-of-the-Governor/News/Press-Releases/2021/07-2021/Governor-Lamont-Signs-Legislation-Banning-Use-Of-PFAS

may not sell, offer for sale or distribute for sale" in Maine products where PFAS has been "intentionally added" except in cases of "unavoidable use."[23]  Similar legislation has also been passed in Vermont and Washington.[24]

61.     In 2018, 3M reached an $850 million settlement with the State of Minnesota brought by the Attorney General alleging that 3M's production of PFAS damaged the drinking water and resources throughout the Minneapolis/St. Paul area, including within residential areas.[25]

62.     A similar personal injury case was filed on behalf of citizens of West Virginia against DuPont related to discharges of PFAS from a manufacturing site into local water sources. That case settled in 2017 for $671 million.[26]

63.     As the risks associated with PFAS become more widely known, it is likely that consumer awareness will continue to grow. It is reasonable for consumers to be concerned about these chemicals, which carry significant health risks and are often undisclosed by manufacturers.

## III.     THE USE OF PFAS IN COSMETIC PRODUCTS

64.     PFAS have long been used in a variety of cosmetic products that come into contact with the skin, including lotions, cleansers, nail polish, shaving cream, foundation, lipstick, eyeliner, eyeshadow, and mascara.

65.     PFAS are used in cosmetic products as emulsifiers, antistatics, stabilizers, surfactants, film formers, viscosity regulators, and solvents. PFAS may be added to products to make them more water-resistant, durable, and spreadable.

66.     Certain commonly used PFAS may be identified on a cosmetic product's label or on its ingredient list.

---

[23]https://www.reuters.com/legal/litigation/maine-outlaws-pfas-products-with-pioneering-law-2021-07-16/

[24] https://www.natlawreview.com/article/connecticut-and-vermont-ban-pfas-food-packaging

[25] https://3msettlement.state.mn.us/

[26]   https://www.reuters.com/article/us-du-pont-lawsuit-west-virginia/dupont-settles-lawsuits-over-leak-of-chemical-used-to-make-teflon-idUSKBN15S18U

67.     The most common PFAS identified and/or disclosed as ingredients in cosmetic products are polytetrafluoroethylene (PTFE), perfluorooctyl triethoxysilane, perfluorononyl dimethicone, perfluorodecalin, and perfluorohexane.

68.     PTFE is known by its brand name, Teflon. According to a 2018 market analysis, Teflon was disclosed as an ingredient in 66 different cosmetic products from 15 brands. Teflon was the most common PFAS compound identified in a product's ingredient list.[27]

69.     This 2018 market analysis identified 13 different PFAS compounds in nearly 200 products from 28 brands.[28]  These compounds were intentionally added ingredients disclosed in each product's ingredient list. That said, a reasonable consumer would be unlikely to identify most of the compounds as part of the PFAS family simply by looking at the name of the ingredient.

70.     Even where PFAS are identified in a product's ingredient list, the quantity of the PFAS contained in the product is not disclosed.

71.     Because there are no formal federal regulations governing what cosmetic labels must disclose, many cosmetic products that contain PFAS do not disclose this on the product label or on the ingredient list.

72.     The 2018 market analysis reviewed only PFAS ingredients that were disclosed in an ingredient list or product label. Disclosed PFAS ingredients, however, make up only a fraction of the PFAS contained in cosmetic products.

73.     PFAS occurs in cosmetic products both as an intended ingredient and as degradation products and impurities from the production of certain PFAS precursors used in certain products.

74.     Prior to 2021, no scientific research had been published analyzing whether PFAS were present in cosmetic products where the label did not disclose the presence of any such

---

[27] https://www.ewg.org/skindeep/contents/is-teflon-in-your-cosmetics/#.Wqk_bb3wajT

[28] PFAS compounds identified by the analysis included: (i) PTFE, (ii) perfluorononyl dimethicone, (iii) perfluorodecalin, (iv) C9-15 fluoroalcohol phosphate, (v) octafluoropentyl methacrylate, (vi) perfluorohexane, (vii) pentafluoropropane, (viii) polyperfluoroethoxymethoxy difluoroethyl peg phosphate, (ix) polyperfluoroethoxymethoxy peg-2 phosphate, (x) methyl perfluorobutyl ether, (xi) perfluorononylethyl carboxydecyl peg-10 dimethicone, (xii) perfluorodimethylcyclohexane, and (xiii) perfluoroperhydrophenanthrene.

compounds.

75.    In June 2021, researchers at Notre Dame published a peer-reviewed analysis of 231 cosmetic products using particle-induced gamma ray emission (PIGE) to screen for total fluorine. Researchers analyzed lip products, eye products, foundations, face products, mascaras, concealers, and eyebrow products purchased from retailers such as Ulta Beauty, Sephora, Target, and Bed Bath & Beyond.[29]

76.    Because all PFAS are comprised of carbon-fluorine bonds, analyzing a product for total fluorine is a method to investigate whether PFAS are present.

77.    Foundations produced the highest median total fluorine concentration, while mascaras produced the largest range of total fluorine measurements. Several mascaras gave the highest fluorine concentrations measured. The three product categories with the highest proportion of fluorine concentrations were foundations, mascaras, and lip products.

78.    Researchers found high fluorine levels in products commonly advertised as "wear-resistant" to water and oils or "long-lasting," including foundations, liquid lipsticks, and waterproof mascaras. Industrial and consumer products containing PFAS are often described as water or stain-resistant.

79.    Researchers performed a further analysis of 29 foundations, mascaras, and lip products using liquid chromatography-tandem mass spectrometry and gas chromatographic mass spectrometry.

80.    This further analysis revealed that short-chain PFAS were most commonly detected in these products.

81.    However, researchers also found that the 29 products also contained long-chain PFAS.

82.    Only 8% of the 231 cosmetics screened for total fluorine listed any PFAS as an ingredient and only 3% of the 29 products in the second round of testing listed any PFAS as an

---

[29] https://pubs.acs.org/doi/10.1021/acs.estlett.1c00240

ingredient. Long and short-chain PFAS were detected in all 29 products analyzed in the second round of testing, meaning that very few disclosed that PFAS were present in the product.

83.     Some cosmetic product ingredients, such as mica, talc, silica, Nylon-12, and color additives, are treated with PFAS to provide hydrophobic properties.

84.     The use of PFAS in cosmetic products is likely to cause unwanted or unforeseen human exposures. Consumers may inadvertently ingest PFAS from liquid lips products or absorb PFAS from mascara through their tear ducts. PFAS may be absorbed through the skin from foundations or other products that require dermal applications.

85.     In addition, PFAS in cosmetic products contributes to PFAS entering wastewater streams and cause ecosystem exposures when those products are discarded in landfills.

86.     Because many PFAS are not disclosed on product labels or in a product's ingredient list, consumers are likely unaware of their personal exposure, as well as their contribution to ecosystem exposures.

87.     Following publication of the June 2021 research, the federal government moved to curtail the widespread inclusion of PFAS in cosmetic products.

88.     In June 2021, bipartisan legislation was introduced in the U.S. Senate by Senator Susan Collins (R-ME) and Senator Richard Blumenthal (D-CT) that would ban PFAS in cosmetic products, including makeup, moisturizer and perfume. That proposed legislation would direct the FDA to issue a proposed rule banning the intentional addition of PFAS in cosmetics within 270 days of the law's enactment and require a final rule to be issued 90 days thereafter.[30]  Similar legislation was introduced in the House of Representatives as well by Representatives Debbie Dingell (D-MI), Brian Fitzpatrick (R-PA), Annie Kuster (D-NH), and John Katko (R-NY).[31]

89.     Members of the scientific community support this proposed legislation. Arelene Blum, PhD, who is the executive director of the Green Science Policy Institute and a co-author of

---

[30] https://www.collins.senate.gov/newsroom/collins-blumenthal-introduce-bill-ban-pfas-chemicals-cosmetics

[31] https://debbiedingell.house.gov/news/documentsingle.aspx?DocumentID=3097

COMPLAINT FOR DAMAGES

the Notre Dame study, stated, "PFAS chemicals are not necessary for makeup. Given their large potential for harm, I believe they should not be used in any personal care products." And Scott Faber, the Senior Vice President of Government Affairs for the Environmental Working Group stated, "Toxic forever chemicals have no place in personal care products."[32]

## IV.    INDEPENDENT LAB TESTING CONFIRMS PRESENCE OF PFAS IN CERTAIN L'OREAL COSMETIC PRODUCTS

90.    After reviewing the study conducted by Notre Dame researchers, Plaintiff sought independent third-party testing to determine whether certain L'Oreal cosmetic products contained PFAS.

91.    To perform this testing, Plaintiff sought out an independent laboratory that utilized industry standard techniques to detect PFAS constituents in cosmetic products.

92.    Plaintiff's independent testing from a third-party lab determined that PFAS, including certain long-chain PFAS like PFOA, were present within several popular L'Oreal waterproof mascara products, including L'Oreal Voluminous Waterproof Mascara, Voluminous Lash Paradise™ Waterproof Mascara, Maybelline Volum' Express the Falsies Waterproof Mascara, Maybelline Volum' Express Total Temptation Waterproof Mascara, Maybelline Great Lash Waterproof Mascara, and Maybelline Total Temptation Waterproof Mascara (collectively, the "Waterproof Mascara Products").

93.    The presence of PFAS in a cosmetic product that is applied to the eye is material to Plaintiff, customers, and members of the putative class.

94.    As set forth below, none of the waterproof mascara products identified herein disclose to the consumer that they contain PFAS that was detected in Plaintiff's testing.

## V.    L'OREAL'S MISLEADING ADVERTISING OF ITS WATERPROOF MASCARA PRODUCTS

95.    Defendant L'Oreal is one of the largest cosmetics companies in the world, generating

---

[32] https://www.collins.senate.gov/newsroom/collins-blumenthal-introduce-bill-ban-pfas-chemicals-cosmetics

over $7 billion in sales per year in the U.S. alone.[33] It owns and operates over 30 different beauty brands from its headquarters in New York City, and employs over 12,000 people in facilities across 14 different states.[34]

96.     According to L'Oreal, its mission is to bring "innovative, effective, high-quality products to our consumers around the world," and to do this L'Oreal selects suppliers "who are experts in their field" to ensure "the quality, effectiveness and traceability of our products."[35]

97.     L'Oréal develops all of its own products and employs 4,000 people in its Research & Innovation centers around the world. L'Oreal claims its research "provid[es] a continuously improving response to the Beauty needs and aspirations of consumers, while the products they create are ever more effective, and provide the highest standards of quality and safety."[36]

98.     L'Oreal touts its commitment to research, proudly declaring on its website that it employs over 470 U.S.-based researchers and scientists.[37]  The L'Oreal Paris brand website states that its products are "Rooted in Science" and "based on the deepest knowledge thanks to its 4000 researchers and 21 scientific research centers around a [sic] world."[38]

99.     L'Oreal claims that "The Quality and Safety of Our Products Are Our Priority" and that it is "Going above and beyond industry standards" by "providing the best [] ingredients, formulation, and performance [] in each and every one of our products."[39]

100.     One of L'Oreal's brands is its popular "L'Oreal Paris" cosmetics line, consisting of makeup (including mascara, lipstick, foundation, etc.), skin care (including eye cream, moisturizer, sunscreen etc.), hair color (including permanent and semi-permanent color, hair highlights, and root

---

[33] https://www.loreal.com/en/usa/

[34] Id.

[35] https://www.loreal.com/en/audiences/suppliers/

[36] https://www.loreal.com/en/beauty-science-and-technology/beauty-research-and-innovation/

[37] Id.

[38] https://www.loreal.com/en/consumer-products-division/loreal-paris/

[39]   https://www.loreal.com/en/commitments-and-responsibilities/for-our-products/product-quality-and-safety/

COMPLAINT FOR DAMAGES

touch up etc.), hair care (including shampoo, conditioner, hair masks etc.), and hair style (including hair gel, hair spray, heat protectant etc.).[40]

101.    Within its "L'Oreal Paris" branded makeup line, L'Oreal offers ten different "Waterproof" mascara products out of its 27 mascara products.[41]  L'Oreal also owns the Maybelline cosmetic brand and offers a number of "waterproof" mascaras under this brand.

102.    Of these products, Plaintiff's testing has thus far determined that the Waterproof Mascara Products contain undisclosed PFAS.

103.    Upon information and belief, discovery is likely to reveal that additional Waterproof Mascara Products contain PFAS that is not disclosed on the product label or packaging.

104.    Defendant formulated, developed, manufactured, labeled, distributed, marketed, advertised and sold the Waterproof Mascara Products throughout the United States, including in this District, during the Class Period.

105.    The packaging, labeling and ingredient lists of the Waterproof Mascara Products that Plaintiff and the Class relied upon when making their purchases of the Waterproof Mascara Products were prepared, reviewed, and/or approved by Defendant and their agents, and were disseminated by Defendant and their agents through the packaging, labeling and ingredient lists that contained the misrepresentations and omissions alleged herein.

106.    Defendant intended for consumers, such as Plaintiff, to rely on the statements and omissions on the packaging, labeling and ingredient lists of the Waterproof Mascara Products when deciding to purchase them. As a result of Defendant's misrepresentations and omissions, reasonable consumers, including the Plaintiff and the Class, were misled into purchasing the Waterproof Mascara Products when, if they had known the truth about the presence of PFAS, they would not have purchased them at all or would have paid less for those products.

107.    L'Oreal owns, manufactures, and distributes the Waterproof Mascara Products and created, allowed, negligently oversaw, and/or authorized the unlawful, fraudulent, unfair,

---

[40] https://www.lorealparisusa.com/

[41] *See* https://www.lorealparisusa.com/makeup/eye/mascara?page=2.

misleading, and/or deceptive packaging, labeling, and ingredient lists of the Waterproof Mascara Products.

108.    Defendant is responsible for selecting and sourcing the ingredients used in the Waterproof Mascara Products and for conducting all relevant quality assurance protocols, including testing, for the Waterproof Mascara Products. Therefore, Defendant knew, or should have known, that failing to disclose the presence of detectable levels of PFAS was a material omission and that it was concealing the true quality, nature, and safety of the Waterproof Mascara Products.

109.    None of the Waterproof Mascara Products disclose on the packaging, labeling or ingredient list that the mascara contains detectable levels of the PFAS detected, including PFOA, PFHxA, PFDoS, and NEtFOSE, among others.

110.    In addition, several of the Waterproof Mascara Products contain misrepresentations that would lead a reasonable consumer to conclude the products are safe and do not contain harmful carcinogenic PFAS compounds.

111.    L'Oreal's Voluminous Waterproof Mascara, for example, states that the product is "ophthalmologist and allergy tested. Suitable for sensitive eyes and contact lens wearers."

112.    An image of the product packaging is set forth below:

113. L'Oreal's Voluminous Lash Paradise Waterproof Mascara contains similar misrepresentations, stating that it is "ophthalmologist and allergy tested. Suitable for sensitive eyes. Tested under dermatological control for safety."

114. Maybelline's Volum' Express the Falsies Waterproof Mascara and Maybelline the Colossal Waterproof Mascara both state that the product is "ophthalmologist tested. Suitable for contact wearers."



115.    Maybelline Great Lash Waterproof Mascara states that it is "contact lens safe" and "hypoallergenic."

116.     These misrepresentations are likely to mislead a reasonable consumer, including Plaintiff, into believing the Waterproof Mascara Products are safe for use and do not contain carcinogenic and/or toxic PFAS compounds not disclosed on the product label or packaging.

## VI.     PLAINTIFF'S USE OF L'OREAL'S WATERPROOF MASCARA PRODUCTS

117.     After viewing in-store advertisements and product packaging for L'Oreal's Voluminous Waterproof Mascara (the "Waterproof Mascara") regarding its purported contents and benefits, including the statements that it is "ophthalmologist and allergy tested" and "Suitable for sensitive eyes and contact lens wearers," Plaintiff began purchasing the Waterproof Mascara in

1   approximately 2017.

2       118.    As a result of Defendants' misrepresentations and omissions, Plaintiff purchased the

3   Waterproof Mascara because she reasonably believed it was safe for her use around, adjacent to and

4   near her eyes.

5       119.    Plaintiff would not have purchased the Waterproof Mascara, or would have paid less

6   for it, had she known that it contained and/or had a material risk of containing dangerous PFAS.

7       120.    Plaintiff had not used any Waterproof Mascara products previously.

8       121.    Plaintiff followed the instructions and applied the Waterproof Mascara Products

9   around her eyes.

10      122.    Plaintiff estimates that during summer 2017, 2018, 2019, 2020 and 2021, she

11  purchased the Waterproof Mascara in total on approximately seven occasions. Prior to purchase,

12  Plaintiff saw and relied upon Defendant's packaging and the Products' ingredient list when making

13  her decision to purchase one of the Waterproof Mascara Products.

14      123.    Plaintiff was unaware that the Waterproof Mascara Products contained detectable

15  levels of PFAS.

16      124.    Plaintiff, like other reasonable consumers, reasonably relied on Defendant's

17  packaging, labeling, ingredient list, and disclosures when deciding to purchase the Waterproof

18  Mascara Products.

19      125.    L'Oreal's Waterproof Mascara Products were misleadingly advertised. As a result of

20  Defendant's negligent, reckless, and/or knowingly deceptive conduct, Plaintiff was injured by

21  purchasing, at a premium price, the Waterproof Mascara Products that were not of the quality and

22  safety promised and that Plaintiff would not have purchased if she had not been misled by

23  Defendant.

24      126.    If Plaintiff or the members of the putative Class were to encounter the Waterproof

25  Mascara Products in the future, they could not reasonably rely on the truthfulness of the packaging

26  unless Defendant's packaging and labeling corrected the misleading packaging omission.

27  **VII.    DEFENDANT'S PACKAGING CLAIMS MISLED AND DECEIVED CONSUMERS**

28      127.    Defendant's packaging claims, representations, and omissions were misleading to

consumers because the Products contained and/or had a material risk of containing PFAS.

128.   Reasonable consumers, including the Plaintiff and the Class, paid Defendant a price premium for the Products because the consumers relied on the accuracy and disclosures on Defendant's packaging.

129.   Reasonable consumers, including the Plaintiff and the Class, considered the above packaging claims to be material to their decision to purchase the Products.

130.   Defendant knew or should have known, yet failed to disclose, that the Products contained and/or had a material risk of containing PFAS, and thus did not conform to the packaging claims.

131.   Defendant also knew or should have known that the presence or material risk of PFAS were a material consideration to consumers like Plaintiff and the Class when they purchased the Products.

132.   A reasonable consumer would not have paid the price premium for the Products if they had known that the Products contained or had a material risk of containing PFAS.

133.   In fact, reasonable consumers, including Plaintiff and the Class, would have refused to purchase the Products entirely if they had known that the Products contained or had a material risk of containing PFAS.

134.   As a result of Defendant's misleading packaging claims and omissions, consumers like Plaintiff and the Class suffered substantial financial losses by paying premium prices for the Products that did not conform to their packaging claims.

**VIII.   CONSUMER RELIANCE WAS REASONABLE AND FORESEEABLE**

135.   Plaintiff and the Class reasonably relied upon Defendant's misleading packaging claims and omissions when making their decision to purchase the Products.

136.   Any reasonable consumer would consider the packaging and labeling of a cosmetics product and, similarly, could not know the omitted information about the presence or risk of PFAS, at the time of purchase.

137.   Consumers reasonably relied upon Defendant's misleading packaging claims as objective statements that communicated, represented and advertised that the Products had specific

product characteristics.

138.    Defendant knew, or should have known, that Plaintiff and the Class would rely on their misleading packaging claims. Defendant designed the Products' packaging, including omitting information about the presence or risk of PFAS, in order to target and induce consumers like Plaintiff and the Class to purchase the Product at the advertised price.

139.    Plaintiff and the Class are intended third-party beneficiaries of any implied warranty between L'Oreal and retailers. Retailers were not intended to be the ultimate consumers of the Waterproof Mascara Products as any implied warranty that exists was intended to benefit consumers.

## IX.    DEFENDANT'S KNOWLEDGE OF THE MISREPRESENTATIONS AND OMISSIONS

140.    Defendant had exclusive knowledge of the contents and formula of its Products, including whether they contained or were at a risk of containing PFAS.

141.    Defendant also had exclusive knowledge of its ingredient suppliers and could have obtained information from their suppliers about the contents of the ingredients, including whether they contained or were at risk of containing PFAS.

142.    Consumers like Plaintiff and the Class were unable to determine or identify that Defendant's Products contained or were at risk of containing PFAS given the Product's mislabeling and failure to disclose the presence or risk of PFAS.

## X.    DEFENDANT ACTED NEGLIGENTLY AND/OR INTENTIONALLY TO MISLEAD CONSUMERS

143.    Defendant acted negligently and/or intentionally to deceive consumers, including Plaintiff and the Class, by its misleading Product packaging that did not disclose the presence or risk of PFAS in the Products.

144.    Defendant did so despite knowing that the presence and/or material risk of PFAS in the Products, as well as knowing that PFAS could be eliminated from its Products. Defendant knew that consumers like Plaintiff and the Class trusted and relied on Defendant to ensure that the

Products conformed to their packaging claims and did not contain undisclosed PFAS.

## XI.   TOLLING OF STATUTES OF LIMITATIONS

145.   Any applicable statute of limitations has been tolled by Defendant's knowing and active concealment of the presence or risk of PFAS in the Waterproof Mascara Products and the misrepresentations and omissions alleged herein. Through no fault or lack of diligence, Plaintiff and members of the Class were deceived regarding the Waterproof Mascara Products and could not reasonably discover that they contained, or may contain, PFAS.

146.   Plaintiff and members of the Class did not discover and did not know of any facts that would have caused a reasonable person to expect that the Defendant was concealing the presence or risk of PFAS in the Waterproof Mascara Products. As alleged herein, the presence or risk of PFAS was material to Plaintiff and members of the Class at all relevant times. Within the time period of any applicable statute of limitations, Plaintiff and members of the Class would not have discovered through the existence of reasonable diligence that the Waterproof Mascara Products contain, or may contain, PFAS.

147.   At all times, Defendant is and was under a continuous duty to disclose to Plaintiff and the Class the true standard, quality, and grade of the Waterproof Mascara Products and to disclose the presence or risk of PFAS due to its exclusive and superior knowledge of the contents and ingredient sourcing for the Waterproof Mascara Products.

148.   Defendant knowingly, actively, and affirmatively concealed the facts alleged herein. Plaintiff and members of the Class reasonably relied on Defendant's knowing, active, and affirmative concealment.

149.   For these reasons, all applicable statutes of limitation have been tolled based on the discovery rule and Defendant's fraudulent concealment, and Defendant is estopped from relying on any statues of limitations in defense of this action.

## CLASS ACTION ALLEGATIONS

150.   Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of herself and the classes. This action satisfies the requirements set

1   forth in Rule 23(a) and Rule 23(b)(3).

2   151.   Plaintiff brings this action on behalf of the following class(es) (together referred to

3   as the "Class"):

4   All individuals in the State of California who purchased the Waterproof Mascara

5   Products from 2018 to the present.

6   152.   Excluded from the Class are Defendant, its legal representatives, assigns and

7   successors and any entity in which Defendant has a controlling interest. Also excluded is the judge

8   to whom this case is assigned and any member of the judge's immediate family and judicial staff.

9   Claims for personal injury are specifically excluded from the Class.

10   153.   This action is brought and may be properly maintained as a class action. There is a

11   well-defined community of interests in this litigation and the members of the Class are easily

12   ascertainable.

13   154.   Numerosity (Rule 23(a)(1)): Although the actual size of the Class is uncertain,

14   Plaintiff is informed and believes that the Class is comprised of at least thousands of purchasers of

15   the Waterproof Mascara Products, making joinder impracticable. The disposition of the claims of

16   the Class in a single action will provide substantial benefits to the parties and the Court.

17   155.   Commonality (Rule 23(a)(2)): Questions of law and fact common to Plaintiff and the

18   Class include, but are not limited to, the following:

19   a.   Whether Defendant owed a duty of care to Plaintiff and the Class;

20   b.   Whether the Waterproof Mascara Products contained detectable levels of PFAS;

21   c.   Whether Defendant knew or should have known that the Waterproof Mascara

22   Products contained detectable levels of PFAS not disclosed on the product label

23   and/or packaging;

24   d.   Whether Defendant failed to test, or require its suppliers to test, the Waterproof

25   Mascara Products and their ingredients for the presence of PFAS;

26   e.   Whether Defendant failed to disclose that the Waterproof Mascara Products

27   contained PFAS;

28   f.   Whether Defendant wrongfully represented that the Waterproof Mascara Products

28

COMPLAINT FOR DAMAGES

were safe for use and did not include toxic PFAS substances;

g. Whether Defendant wrongfully represented, and continues to represent, that the Waterproof Mascara Products are safe for use on eyes and high-quality;

h. Whether reasonable consumers would consider that the Waterproof Mascara Products containing detectable levels of PFAS to be a material fact in purchasing the Waterproof Mascara Products;

i. Whether Defendant continued to manufacture and sell the Waterproof Mascara Products despite knowing that they contain detectable levels of PFAS;

j. Whether Defendant's omission of the presence of PFAS in the Waterproof Mascara Products was likely to mislead, deceive, confuse, or confound consumers acting reasonably;

k. Whether Defendant violated California law;

l. Whether Defendant engaged in unfair trade practices;

m. Whether Defendant engaged in false advertising;

n. Whether Defendant made fraudulent omissions;

o. Whether Defendant unjustly enriched itself at consumers' expense;

p. Whether Defendant's conduct was negligent per se;

q. Whether Defendant had a duty to disclose the material omission regarding the presence of detectable levels of PFAS in the Waterproof Mascara Products;

r. Whether Plaintiff and the Class are entitled to actual, statutory, and treble damages; and

s. Whether Plaintiff and the Class are entitled to declaratory and injunctive relief.

156. <u>Typicality (Rule 23(a)(3))</u>: The claims of the representative Plaintiff are typical of the claims of members of the Class, in that the representative Plaintiff, like all members of the Class, purchased the Waterproof Mascara Products from Defendant without knowing that it contained detectable levels of PFAS and, if Plaintiff, like all members of the Class, had known that information, she would not have purchased the products or would have paid less for them. Thus, the representative Plaintiff, like all members of the Class, has suffered a common injury. The factual

basis of Defendant's misconduct is common to all members of the Class.

157.   <u>Adequacy (Rule 23(a)(4)):</u> Plaintiff will fairly and adequately represent and protect the interests of the Class. Plaintiff has retained counsel with substantial experience in prosecuting consumer class actions, including actions involving mislabeling and false advertising, product liability, and violation of consumer protection statutes. Plaintiff and her counsel are committed to vigorously prosecuting this action on behalf of the Class and have the financial resources to do so. Neither Plaintiff nor her counsel have any interests adverse to those of the Class.

158.   <u>Predominance of Common Questions (Rule 23(b)(3)):</u> Common questions of law and fact predominate over any questions involving individualized analysis. There are no fundamental questions of fact or law that are not common to members of the Class. The undisclosed presence of PFAS in the Waterproof Cosmetics Products is a common question, as is the Defendant's knowledge regarding the presence of detectable levels of PFAS in its Waterproof Mascara Products and Defendant's unform omission to members of the Class of this material fact. Common questions of law include whether Defendant's conduct violates state consumer protection statutes and other laws, and the Class members' entitlement to damages and remedies.

159.   <u>Superiority (Rule 23(b)(3)):</u> Plaintiff and members of the Class have suffered and will continue to suffer harm and damages as a result of Defendant's unlawful and wrongful conduct. A class action is superior to other available methods for the fair and efficient adjudication of the subject controversy. Most members of the Class likely would find the cost of litigating their individual claims to be prohibitive and will have no adequate remedy at law. Thus, absent a class action, members of the Class will continue to incur damages and Defendant's misconduct will proceed without remedy. Class treatment of common questions of fact and law is superior to multiple individual actions or piecemeal litigation because it will conserve the resources of the courts and the litigants and promote consistency and efficiency of adjudication. There is no impediment to the management of this action as a class action because the questions of fact and law are virtually identical for Plaintiff and all Class members.

160.   <u>Injunctive Relief (Rule 23(b)(2)):</u> Defendant has engaged in, and continues to engage in, business practices which are unfair and fraudulent by, among other things, failing to disclose the

material fact that the Waterproof Mascara Products contain detectable levels of PFAS. Plaintiff seeks class-wide injunctive relief on grounds consistent with the standards articulated in Rule 23(b)(2) that establish final injunctive relief as an appropriate class-wide remedy, in that Defendant continues to manufacture, market, and sell the Waterproof Mascara Products and omit material facts. The injuries suffered by Plaintiff and the Class as a result of Defendant's actions are ongoing.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

**Violation of California Consumers Legal Remedies Act ("CLRA")**

161.   Plaintiff incorporates by reference all preceding allegations contained in this Complaint.

162.   Defendant is a "person" as defined by California Civil Code section 1761(c).

163.   Defendant engaged in unfair competition or unfair or deceptive acts or practices in violation of California Civil Code sections 1770(a)(5), (a)(7), and (a)(9) when Defendant failed to disclose that its Waterproof Mascara contained and/or had a material risk of containing PFAS and by misrepresenting that it was safe for use on eyes.

164.   Plaintiff and Class Member's relied on Defendant's packaging representations and omissions.

165.   Defendant's deceptive practices were specifically designed to induce Plaintiff and Class Members to purchase the Waterproof Mascara Products. Defendant engaged in marketing efforts as detailed in this complaint, to reach Class Members, to persuade them to purchase Waterproof Mascara developed and marketed by Defendant.

166.   To this day, Defendant continues to engage in unlawful practices in violation of the CLRA.  Defendant continues to conceal the defective nature of the Waterproof Mascara Products and have failed to disclose, on inquiry from Plaintiff and Class Members, the true nature of the Waterproof Mascara Products including that it contained and/or had a material risk of containing PFAS.

167.   Plaintiff served Defendant with notice of its CLRA violations by serving notice on

February 1, 2021.  A copy of the notice is attached to this Complaint as Exhibit A.

WHEREFORE, Plaintiff on behalf of herself and for all others similarly situated, demands a permanent injunction be issued against Defendant to refrain from continued advertising of Waterproof Mascara that omits material facts about product, including that it contained and/or had a material risk of containing PFAS. Plaintiff further seeks injunctive relief forcing Defendant to replace and all Waterproof Mascara Products for Class Members, plus costs and attorneys' fees pursuant to California Civil Code section 1780(d).  Plaintiff will amend this complaint to request damages under this cause of action unless Defendant remedies the defect pursuant to Plaintiff's demand letter.

## SECOND CAUSE OF ACTION

### Violation of California Unfair Competition Law – Unlawful Business Practice

168.   Plaintiff incorporates by reference all preceding allegations contained in this Complaint.

169.   California Business and Professions Code section 17200 *et seq*. prohibits acts of unfair competition, which includes unlawful business practices.

170.   Defendant engaged in unlawful business practices in failing to disclose its Waterproof Mascara Products contained and/or had a material risk of containing PFAS.

171.   Defendant's deceptive practices constitute an unlawful business practice in that the practices were specifically designed to induce Plaintiff, Class Members, to purchase and use the Waterproof Mascara Products.

172.   To this day, Defendant has engaged in and continued to engage in unlawful business practices by concealing the true nature of the Waterproof Mascara Products. Defendant has knowingly misrepresented to Class Members the Waterproof Mascara Products' qualities and characteristics.

173.   As a direct and proximate cause of Defendant's unfair and unlawful methods of competition and unfair, deceptive, or unlawful acts or practices, Plaintiff and Class Members have suffered actual damages. Plaintiff and Class Members must incur costs to replace the Waterproof

1   Mascara Products and they lose the value of the product as they discontinue use.

2       174.    As a proximate result of their unlawful, unfair, or fraudulent practices, Defendant

3   has been unjustly enriched and should be required to make restitution to the Plaintiff and Class

4   Members pursuant to sections 17203 and 17204 of the California Business & Professions Code.

5       WHEREFORE, Plaintiff, on behalf of herself and all others similarly situated, demands

6   judgment against Defendant, for restitution and/or disgorgement of funds paid to Defendant by

7   Plaintiff and Class Members to purchase the Waterproof Mascara Products or in the form of

8   replacement of the product.

9                          **THIRD CAUSE OF ACTION**

10                **Violation of Unfair Competition Law – Unfair Business Practice**

11      175.    Plaintiff incorporates by reference all preceding allegations contained in this

12  Complaint.

13      176.    Defendant engaged in an unfair business practice by knowingly failing to disclose

14  material facts concerning the Waterproof Mascara Products and by misrepresenting that the

15  Waterproof Mascara Products are safe to use on eyes.

16      177.    Defendant's "unfair" practices were designed to induce Plaintiff and Class Members,

17  to purchase and use of the Waterproof Mascara Products.

18      178.    To this day, Defendant has failed to disclose facts concerning the contents

19  Waterproof Mascara Products, facts that would be and are material to consumers, on which

20  consumers relied when purchasing and using the Waterproof Mascara.

21      179.    As a direct and proximate cause of Defendant's unfair methods of competition and

22  unfair or deceptive acts or practices, Plaintiff and Class Members have suffered actual damages.

23  The Waterproof Mascara Products contained and/or had a material risk of containing dangerous

24  PFAS, which will require Plaintiff and Class Members to incur costs to prematurely replace the

25  product.

26                         **FOURTH CAUSE OF ACTION**

27                          **Breach of Implied Warranty**

28      180.    Plaintiff incorporates by reference all preceding allegations contained in this

Complaint.

181.    Defendant designed, developed, and sold the Waterproof Mascara Products knowing that Plaintiff and Class members would use it.

182.    Defendant is a merchant of the Waterproof Mascara and marketed, promoted, and sold it to the consuming public.

183.    Defendant expected the consuming public, including Plaintiff and Class Members, to use the Waterproof Mascara Products and such use was reasonably foreseeable.  The Waterproof Mascara Products were not merchantable at the time Defendant sold them.

184.    Defendant warranted to Plaintiff and Class Members that the Waterproof Mascara Products were of a quality that would pass without objection in the trade and was at least fit for the ordinary purposes for which such goods were used, and in all other respects were of merchantable quality.

185.    Plaintiff and members of the Class relied on that implied warranty.

186.    As alleged here, Defendant concealed and failed to disclose the true nature of the Waterproof Mascara Products and failed to adequately warn Plaintiff and the Class that the Waterproof Mascara Products contained and/or had a material risk of containing dangerous PFAS.

187.    Defendant breached its implied warranties of merchantability because the Waterproof Mascara Products were not of merchantable quality and was defectively designed and was unfit for the ordinary purposes for which it was designed and used.

188.    Defendant did not properly disclaim the warranty of merchantability and fitness for a particular purpose.

189.    Plaintiff and the Class notified Defendant of the defective nature of the Waterproof Mascara Products and that Defendant breached these warranties within a reasonable time of discovery.

190.    As a direct and proximate result of Defendant's breaches of the implied warranty of merchantability and fitness for a particular purpose, Plaintiff and members of the Class have been damaged in an amount to be proven at trial.

**FIFTH CAUSE OF ACTION**

**Unjust Enrichment**

191.    Plaintiff incorporates by reference all preceding allegations contained in this Complaint.

192.    As the intended and expected result of its conscious wrongdoing, Defendant has profited and benefited from the purchase of the Waterproof Mascara by Plaintiff and the Class. Plaintiff and Class's payments for the Waterproof Mascara Products flowed to Defendant.

193.    Defendant have voluntarily accepted and retained these profits and benefits, derived from Plaintiff and the Class, with full knowledge and awareness that, as a result of its misconduct, Plaintiff and the Class were not receiving products of the quality, nature, fitness or value that had been represented by Defendant, and that Plaintiff and the Class, as reasonable consumers, expected.

194.    Defendant has been unjustly enriched by its fraudulent and deceptive withholding of benefits from Plaintiff and the Class, at the expense of Plaintiff and the Class.

195.    Defendant's retention of these profits and benefits is inequitable.

196.    Plaintiff and the Class seek the disgorgement and restitution of Defendant's wrongful profits, revenue, and benefits, plus interest, to the extent and in the amount deemed appropriate by the Court, and such other relief as the Court deems just and proper to remedy Defendant's unjust enrichment.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that the Court enter judgment against Defendant and in favor of Plaintiff, and to award the following relief:

Certification of the Class with Plaintiff appointed as class representative and the undersigned appointed as Class Counsel;

A declaration that Defendant is financially responsible for notifying all Class Members of the problems with the Waterproof Mascara Products;

Injunctive relief requiring Defendant to replace all Waterproof Mascara Products owned by the Class, and enjoining Defendant from continuing to mislabel Waterproof Mascara Products and require Defendant to disclose the true nature of the Waterproof Mascara Products, including that they contain and/or have a material risk of containing PFAS;

1    A declaration that Defendant must disgorge, for the benefit of the Class, all or part of its ill-

2  gotten profits received from the sale of the Waterproof Mascara Products;

3    An award of all actual, general, special, incidental, statutory, treble, or other multiple, punitive

4  and consequential damages under statutory and common law as alleged in this Complaint, in an

5  amount to be determined at trial, except that Plaintiff does not yet seek damages under the CLRA;

6    An award to the Class for economic injury due to the price premium that they paid at or

7  following the point of sale;

8    An award of pre-judgment and post-judgment interest at the maximum rate allowable by law;

9    An award of costs and attorneys' fees, as allowed by law, and/or from a common fund created

10  hereby; and

11    Orders granting such other and further relief as may be appropriate.

12    Dated: February 22, 2022        Respectfully submitted,

13

14         _/s/ Devin Bolton_____
           Devin Bolton (SBN 290037)
15          dbolton@weitzlux.com
           **WEITZ & LUXENBERG, PC**
16         1880 Century Park East, Suite 700
           Los Angeles, CA 90067
17         Phone: (212) 558-5552
           Fax:    (212) 344-5461
18

19         James Bilsborrow (*pro hac vice* application
           forthcoming)
20          jbilsborrow@weitzlux.com
           **WEITZ & LUXENBERG, PC**
21         700 Broadway
           New York, NY 10003
22         Phone: (212) 558-5500
           Fax:    (212) 344-5461
23

24         Christopher A. Seeger (*pro hac vice* application
           forthcoming)
25          cseeger@seegerweiss.com
           Matt Pawa (*pro hac vice* application forthcoming)
26          mpawa@seegerweiss.com
           Jeff Grand (*pro hac vice* application forthcoming)
27          jgrand@seegerweiss.com
28

Christopher Ayers (*pro hac vice* application forthcoming)
  *cayers@seegerweiss.com*
**SEEGER WEISS LLP**
55 Challenger Road
Ridgefield Park, NJ 07660
Phone: (973) 639-9100
Fax:    (973) 679-8656

Sam Strauss (p*ro hac vice* application forthcoming)
  *sam@turkestrauss.com*
Raina Borrelli (*pro hac vice* application forthcoming)
  *raina@turkestrauss.com*
**TURKE & STRAUSS LLP**
613 Williamson St., Suite 201
Madison, Wisconsin 53703-3515
Telephone: (608) 237-1775
Facsimile: (608) 509 4423

*Attorneys for Plaintiff*

COMPLAINT FOR DAMAGES

1

## JURY TRIAL DEMAND

2       Plaintiff demands a trial by jury on all of the triable issues within this pleading.

3

4    Dated: February 22, 2022                    Respectfully submitted,

5

6                                                 _/s/ Devin Bolton_____
                                                 Devin Bolton (SBN 290037)
7                                                   dbolton@weitzlux.com
8                                                **WEITZ & LUXENBERG, PC**
                                                 1880 Century Park East, Suite 700
9                                                Los Angeles, CA 90067
                                                 Phone: (212) 558-5552
10                                                Fax:    (212) 344-5461

11                                                James Bilsborrow (*pro hac vice* application
12                                                forthcoming)
                                                   jbilsborrow@weitzlux.com
13                                               **WEITZ & LUXENBERG, PC**
                                                 700 Broadway
14                                                New York, NY 10003
                                                 Phone: (212) 558-5500
15                                                Fax:    (212) 344-5461

16                                                Christopher A. Seeger (*pro hac vice* application
17                                                forthcoming)
                                                   cseeger@seegerweiss.com
18                                               Matt Pawa (*pro hac vice* application forthcoming)
                                                   mpawa@seegerweiss.com
19                                               Jeff Grand (*pro hac vice* application forthcoming)
                                                   jgrand@seegerweiss.com
20                                               Christopher Ayers (*pro hac vice* application
21                                                forthcoming)
                                                   cayers@seegerweiss.com
22                                               **SEEGER WEISS LLP**
                                                 55 Challenger Road
23                                                Ridgefield Park, NJ 07660
                                                 Phone: (973) 639-9100
24                                                Fax:    (973) 679-8656

25

26                                               Sam Strauss (p*ro hac vice* application forthcoming)
                                                   sam@turkestrauss.com
27                                               Raina Borrelli (*pro hac vice* application forthcoming)
                                                   raina@turkestrauss.com
28                                               **TURKE & STRAUSS LLP**

613 Williamson St., Suite 201
Madison, Wisconsin 53703-3515
Telephone: (608) 237-1775
Facsimile: (608) 509 4423

*Attorneys for Plaintiff*

COMPLAINT FOR DAMAGES